## UNITED STATES OF AMERICA *v.* A LOT OF SILK GOODS AND OTHER MERCHANDISE (Mrs. S. Kataoka, claimant).

### November 15, 1912.

1. *Jury—Waiver:* Jury may be waived by proceeding to trial in the absence of, and without demand for, a jury.

2. *Customs duties—Fraudulent attempt to import:* A fraudulent attempt to import or bring in dutiable merchandise is not reached by Rev. Sat., sec. 3082, which is directed only against actual importation or bringing in.

3. *Same—Fraudulent attempt to enter or introduce—Completed fraud:* To constitute a fraudulent attempt to enter or introduce merchandise into the commerce of the United States in violation of the customs administrative act, June 10, 1890, c. 407, sec. 9, 26 Stat. 135,

as amended by the tariff act of Aug. 5, 1909, c. 6, sec. 28, subsec. 9, 36 Stat. 97, it is not necessary that the government actually be deprived of revenue, but only that the acts of attempt be of a character calculated to work such deprival.

4. *Same—Same—Use of fraudulent devices—Forfeiture:* Though mere intent to fraudulently introduce merchandise into the country by devices of concealment, is not within said subsection 9; yet where the incoming passenger is actually making use of such devices, the merchandise is forfeitable under the statute.

5. *Same—Same—Forfeiture:* The said amendatory subsection 9 applies to goods attempted to be imported or introduced by means of fraudulent devices of concealment, and for a violation thereof by such an attempt a forfeiture of the goods, or their value, follows.

6. *Same—Dutiable merchandise in baggage—Sufficiency of declaration or entry:* The importer of dutiable merchandise fraudulently concealed in his baggage, does not by merely remaining passive fulfill the obligation of at least putting the customs officers on inquiry as to such merchandise; but the disclosure must be direct or fairly equivalent to a direct disclosure.

7. *Same—Declaration and entry—Customs regulations and procedure:* The fact that an anomalous, or an extraordinary, procedure is being pursued, by the customs officers, of getting merchandise through the customs line, affords no excuse to a passenger who attempts by devices of concealment to introduce merchandise into this country in violation of subsection 9 aforesaid.

8. *Same—Same—Same—Locus poenitentiae:* In such case there is no *locus poenitentiae*, extending until the customs officer shall pursue the regular, or the usual, course; but the goods intended to be unlawfully entered or introduced may be seized as forfeited at any time after the concealment is discovered when once the passenger has started the goods through the customs line with intent to use the devices of concealment to evade duties.

9. *Same—Entry of imported merchandise—Time for completing entry:* The fifteen day limit within which to complete entry of imported merchandise, under Rev. Stat., sec. 2785, does not apply to the case of a passenger's taking his goods with him immediately through the customs line, so as to afford a *locus poenitentia* to an importer who has concealed articles in his baggage with intent to evade duties; nor do Customs Regulations, 1908, article 1092, providing that certain goods shall be sold if not entered within one year, give a *locus poeni-*

*tentiae* or a privilege of making complete entry at any time within that period.

10. *Same—Smuggling—Forfeiture—Circumstantial evidence:* In a forfeiture proceeding under said subsection 9, letters found in a passenger's baggage, indicating a plan to smuggle goods for purpose of sale, may be sufficient circumstantial evidence to sustain a finding, against the passenger, of a fraudulent attempt to enter or introduce, so as to satisfy that part of the statute requiring entry or introduction to be an entry or introduction into the *commerce* of the country; even though the passenger is not himself the addressor or the addressee or referred to in the correspondence.

11. *Same—Forfeiture—Burden of proof—Measure of proof:* In case of probable cause for an information in rem for forfeiture under subsection 9 aforesaid, the burden is placed on the claimant by Rev. Stat., sec. 909; and the government is not, in any event, required to prove its case by anything more than a preponderance of the evidence.

12. *Statutes—Construction of forfeiture provisions:* Though the statutes authorizing forfeiture for violations of the law of customs administration, are subject to strict construction, they are also to be construed reasonably and so as to give effect, if possible, to every word thereof.

*In Rem:* On information for forfeiture.

*C. C. Bitting,* Assistant U. S. Attorney, for the United States.

*G. S. Curry* and *A. K. Ozawa,* for claimant.

CLEMONS, J. This is an information *in rem* praying for the forfeiture to the United States of a lot of silk goods and other merchandise, seized by customs officers at Honolulu and now held by the collector for that port, for alleged violations of the customs revenue laws. The claim of forfeiture is based on three alleged grounds: (1) That "lately before the time of the said seizure" the said merchandise, being dutiable, was "fraudulently and knowingly imported and attempted to be brought into the said United States contrary to law, that is to say, without the payment of . . .

duties,"—i.e., a violation of Rev. Stat., sec. 3082. (2) That at said time one Mrs. S. Kataoka, "the importer, owner, or agent of the importer or owner, . . with the intent to defraud the revenue of the said United States, did knowingly and unlawfully attempt to bring in and make a landing of, and attempt to introduce into the commerce of the United States, said imported merchandise at the port of Honolulu by means of a fraudulent device, or of fraudulent devices and fraudulent appliances, . . . consisting in part of a bag so constructed that a part of the said merchandise, so attempted to be introduced into the commerce of the United States, might be and was concealed in said bag from the customs officers of the United States, . . . and consisting also in part of the packing of another part of said merchandise by folding and sewing in such a manner that the said other part of said merchandise might be and was concealed in said other articles of clothing from the customs officers of the United States,"—i.e., a violation of sub-section 9 of section 28 of the tariff act of 1909. 36 Stat. 97. (3) That at said time the said person did "knowingly, willfully and unlawfully neglect, fail and omit with intent to defraud the revenue of the United States, to disclose and declare to the proper officers of the customs at said port of Honolulu, the true character, nature, quantity, intended use and destination of said merchandise, by means whereof the said United States was then and there deprived of the lawful duties accruing upon the merchandise aforesaid,"—i.e., a further violation of said subsection 9.

[1]    The case was submitted to the court for determination without the intervention of a jury,—there having been no formal waiver, but the parties having proceeded to trial in the absence of, and without demand for, a jury and having continued with the trial, although the want of a formal waiver was called to their attention at the hearing. See *Kearney v. Case*, 12 Wall. 275 *Madison County v. Warren*, 106 U. S. 623; *United States v. Harris*, Id. 635; *Perego v.*

*Dodge,* 163 U. S. 166. From the evidence the facts appear as hereinafter set forth.

Upon arrival of the steamship Korea at the port of Honolulu, on July 8th, 1912, the baggage of a third class or steerage passenger, Mrs. Shigeno Kataoka, who here intervenes as claimant of the seized property, was taken to the immigration station for inspection, under a practice whereby the usual declaration in writing is not required of third-class passengers coming to Honolulu from the Orient, as it is of the first and second classes, but it is left to the customs inspectors to ascertain without the aid of such declaration what if any articles brought by the third class passengers are subject to duty. It may be noted, that the practice has been adopted, it is understood, to alleviate the condition, that this class of passengers coming from the Orient is made up largely of persons who bring nothing dutiable, who are more or less illiterate and speak only a foreign language, and who come in such numbers as to make a written declaration for each one impracticable under all the circumstances, particularly that of the want of a force of interpreters and other officers adequate to the prompt preparation of such declarations. A similar practice obtains at the Canadian and Mexican frontiers, in case of free goods or goods upon which the duty does not exceed five dollars. Customs Regulations, 1908, art. 192 and marginal citations.

The claimant pointed out to a customs inspector a trunk which apparently contained only kimonos and other garments. The weight and thickness of kimonos lying in the middle and lower part of the trunk aroused suspicion, and upon the opening of one of them a bolt of silk was disclosed sewed into a sleeve in such manner as to prevent its falling out on the lifting of the kimono. Sewed into the sleeve of another kimono were five unmade obis or sashes in rolls. Sewed into the inside of a woolen skirt were three pieces of new crepe silk, each about a foot wide and a yard and a half long. The inspector then made no further examination,

and closed the trunk. A basket disclosed similar conditions; for instance, pieces of new crepe silk were sewed into the sleeves of kimonos. Having ascertained this fact, the inspector closed the basket without further search. There was next brought a large cloth bag in which were found seven new silk obis in a roll with the edges of the outside obi sewed together so as to conceal the others. The inspector then came to what appeared to be the bottom of the bag, but what was discovered to be a false bottom, securely stitched in, about six inches above the real bottom. Upon tearing open the false bottom, there were seen below eighty new silk collars each mounted on pasteboard as if for commercial display. There was also in this bag a bundle of letters, or papers which bore writing, all in the Japanese language. In one of the containers were four pieces of new crepe silk, each thirteen inches wide and all of the aggregate length of fifty-six feet, sewed inside of an old silk obi,—in the top of the bag, as the inspector says ,or in the trunk, as the claimant insists. So far as this insistence is an argument for her consistency in having placed valuable material in the trunk which contained clean goods, rather than in the upper part of the bag with food and soiled clothing, the argument is not worth much attention in view of the undisputed evidence that she left in the upper part of the bag the roll of seven new silk obis, which would be as liable to injury as the crepe silk which, she insists, was, for its protection, placed elsewhere. Two large pieces of baggage, one containing bedding and the other wearing apparel, and some small pieces of hand baggage, all bore nothing dutiable and were passed.

The trunk, basket and bag, together with their contents, were thereupon seized by customs officers. The examiners and appraisers, through whose hands the seized merchandise passed in due course, found the articles listed in detail in the information (including the concealed articles, which were all dutiable), consisting mainly of goods in the piece,

and of the aggregate appraised value of $1,093.13. This list contained, among other things, 30 pieces of silk cloth, 263 silk woven belts, 90 silk woven collars, 62 silk woven sleeves, 40 silk kimonos, 74 part wool kimonos, 8 raincoats.

The character of the concealed goods and the manner in which they were packed (see *United States v. One Bag of Crushed Wheat*, 166 Fed. 562, 565, 567), as well as the uncommon number and quantity of certain articles as mere baggage or as articles merely for personal use, all force the conclusion, under all the circumstances, of an intent to secure by fraudulent means their introduction into this country without payment of duty. And the letters and papers found in the baggage are incriminating circumstantial evidence of a plan to defraud the government. Over claimant's objection, they were admitted in evidence on the authority of the ruling of Judge Robertson of this court in the case of Lum Yan, unreported, affirmed in *Lum Yan v. United States*, 193 Fed. 970, 972-973. One of the letters, dated "April 30th" (without giving the year), addressed to "My dear Shigeno" and signed "Your husband," reads in translation:

"Send your goods by the first steamer. And in order to escape paying the customs duties, I would advise you to handle and wrinkle the kimonos, so that they would appear worthless. I would like you to buy some silk goods and send them along with an iron, with which I can iron the wrinkled part of the kimonos, after their arrival here. In that way, the kimonos and the goods will appear fine and orderly. Bring these goods as if they are your own wearing apparel, ready for wear. Ask your friends to help you in this matter."

The next to the last sentence should be noted for its circumstantial bearing on the vital question, of the intended use of these goods. The following letter signed "Kenichi Kataoka" (which the claimant testified was her husband's name), addressed to "Dear parents Katsunai," and undated, has, circumstantially, a bearing, adverse to the claimant, on

the question whether the concealed goods were intended to be introduced into the "commerce of the United States:

"The goods bought at Osaka are cheap and reasonable, and those bought at Kioto are costly; but their quality is much superior to those obtained at Osaka.    Personally I think it is better for you to buy goods at Kioto, because, after their arrival in Honolulu, the price, though high, will bring in good income."

Another letter, unsigned, unaddressed and undated, says, *inter alia:*

"Should you succeed in getting 700 yen for Okada, you can get materials valued at 2050 yen, after deducting the passage money and other incidental expenses.    As soon as I can raise some money, I will send it to you."

This letter speaks in some detail of plans for borrowing money for these purchases.    It is significant that the claimant, while endeavoring to explain other suspicious circumstances, made no offer to account for these letters.    Also the fact is of considerable significance, that this was her fourth passage, within a period of six years, through the customs line at the port of Honolulu; wherefrom some knowledge of customs practice and of the obligations of incoming passengers, may fairly be inferred; such an experience would ordinarily teach the policy of avoiding any circumstance in the least likely to raise suspicion.    *The Robert Edwards,* 6 Wheat. 187, 190-191.

In reaching the conclusion of an intent to evade payment of duty,—an intent not abandoned but continuing down to the time of the inspector's discovery of concealment,—we have not failed to give full consideration to the testimony in behalf of the claimant; but, in view of all the evidence, not only direct but circumstantial, her defense is not convincing. The explanation of the bag's false bottom is, that it was designed to protect only the articles below (and for which there was no room in the trunk or elsewhere) from food and soiled clothing carried above; and the explanation of

the concealment of silk within the sleeves of cotton kimonos and in other places, is a purpose only of protecting the more valuable material against fumigation by health authorities at various parts of the way. It is fair, to note that the cloth used for the false bottom is not as well adapted to concealment as it might be, for it is considerably more faded and worn than the lining of the bag and different in color, being of a dull blue ground bearing inconspicuous checks made up of narrow white lines, while the lining is of a dull brown ground bearing narrow inconspicuous stripes of other dull colors. But the crude manner in which this part of the plan was carried out does not weaken the conviction of the plan's existence. And it is noticeable, that the cloth used for the false bottom is so porous and worn, even worn through in small spots here and there, that it is not more adapted to the asserted purpose of protection from the food and soiled clothing above, than it is adapted to a "good job" of concealment. It is also to be noted that the food there found (and none other was described by witnesses) was not in its nature "dirty," being dried beans in a cloth sack and other food in tins. The conflict of testimony as to whether the inspector himself discovered and tore open the false bottom, or whether the claimant called the inspector's intention to it by herself tearing it open, might make the case somewhat more difficult, if other evidence in favor of the government were wanting; but on the whole, more confidence is felt in the observation and memory of the Federal customs inspector (despite his interest in the proceeds of the forfeited goods), as well as of the officer of the Territory of Hawaii engaged in inspecting baggage for infected fruit, who both had active concern with the examination of this baggage, than in the observation and memory of the two "runners" for a Japanese hotel, who were mere bystanders except for their interest in a possible patron of their house.

[2] From the evidence, the court finds for the government on the second count of the information, alleging a vio-

lation of the first part of subsection 9 aforesaid by an attempt to enter or introduce imported merchandise into the commerce of the country by false or fraudulent practices or appliances.  As to the third count, alleging a violation of the last part of subsection 9 aforesaid, by an omission "to disclose and declare to the proper officers  .   .   .   the true character," etc., of the concealed goods "by means whereof the United States was   .   .   .   deprived of the  .  .  .  .  duties," strictly, the proof has failed, for an actual deprival of duties is alleged and none is proved.  Though the statute covers both prospective deprival and consummated deprival, yet when the latter is alleged such allegation would seem to contemplate, within the statute, that the goods should have actually passed the customs line,—e.g., a case of successful smuggling accompanied by a "willful omission," etc., would satisfy the actual allegation of count three, while an attempt to smuggle would not.  The use of the words "shall or may" in said subsection 9 (quoted at length in foot note, post) supports this view.  It must be admitted that the matter of the proof under count three involves questions of difficulty (not raised in argument but apparent on study), which it would be unprofitable to consider, in view of the extended discussion of the second count, below, upon which count alone the evidence is clearly sufficient to sustain the information.  The above observations on count three may, therefore, be taken only as suggestive of probable conclusions.

As to the first count, alleging a violation of section 3082 aforesaid, in that merchandise was "fraudulently imported and attempted" to be "brought into the United States . . . without the payment of duties:"  This statute does not reach attempts.  *Keck v. United States,* 172 U. S. 434 444, 445.  Therefore, the allegation of an "attempt to bring in," is an unauthorized allegation; and the proof, as here, of only an attempt to "import  .  ..  .  without the payment of  .  .  .  duties," is, likewise, vain.  And apart from

what the statute authorizes, the pleading of an importation is, of course, not satisfied by the proof of an attempt to import.

Before concluding, some contentions of the claimant should be noted as worthy of special attention. A summary of these, with the cases relied upon in their support, and our view thereof, now follows:

(i). Even admitting, for the sake of argument only, a fraudulent intent, still as the United States has not yet been deprived of any duties on these goods and there is no possibility of such deprival by reason of the claimant's acts alone, there can, as the claimant contends, be no forfeiture under subsection 9 of section 28 of the tariff act of 1909, 36 Stat. 11, 97; citing *United States v. Twenty-five Packages of Panama Hats*, 193 Fed. 438 (applying this very subsection) and *United States v. Ninety-nine Diamonds*, 139 Fed. 961, 2 L. R. A. (N. S.) 185 (applying a corresponding provision of the customs administrative act of 1890, 26 Stat. 131, 135, 136, thereby repealed).

[3] The contention cannot prevail in the face of the fact that this provision of the statute of 1909 is directed not only against acts whereby "the United States shall . . . be deprived of the lawful duties," but also against acts whereby the government "*may* be deprived" of such duties. Subsection 9 aforesaid.* So far as the *Panama Hat* case, supra [subsequently reversed, 231 U. S. 358], is concerned, if the decision there were not plainly controlled by

---

*"That if any consignor, seller, owner, importer, consignee, agent, or other person or persons, shall enter or introduce, or attempt to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or persons, shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case, or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates. . . . ."

the fact of the claimant consignee's innocence of the fraud and undervaluation of the consignor—which is enough to distinguish it from the case at bar wherein the element of innocence is wanting,—still the use of the word "may" in the phrase of the new law "shall or may be deprived," would compel the conclusion of the clearest intent to reach cases not reached by the law which had hitherto been in force (act of 1890, supra) and which was applied in the case of *the Ninety-nine Diamonds,* supra, wherein the language of the corresponding phrase of that act, "shall be deprived," was held inefficient to reach a case in which the government was not actually deprived of the duties. Id., 965. See *United States v. Boyd,* 24 Fed. 692, 695, holding that the word "shall" in the former law might be taken in a broad sense, of potentiality.

[4a]  To further distinguish the *Diamonds* case from the present case in which an attempt is alleged: Had the information in the *Diamonds* case contained a count based on an attempt, the court there would, of course, have been in no way concerned with the government's ultimate deprival of its revenue,—at least, if any effect at all is to be given to the use of the word "attempt" in the statute: indeed, this word was plainly calculated to cover culpable cases of failure to effect such deprival—culpable cases as distinguished from cases, such as those of *United States v. One Trunk* (Gannon, claimant), 175 Fed. 1012, syll. 1, and *United States v. One Trunk* (McNally, claimant), 171 Fed. 772, syll. 3, in which the party takes some preliminary steps in the unlawful enterprise but, repenting before the "eleventh hour," makes no use of his fraudulent devices. As the facts are found in the case at bar, the claimant made all the use that she could of the devices of concealment, to effect a purpose to evade payment of duties. *United States v. Boyd,* 24 Fed. 692, 694-695.

Another means of distinguishing the *Diamonds* case is found in the later addition to the statute of the word "intro-

duce," by the phrase "enter or introduce," thus curing the narrow scope of the former law wherein the word "enter" alone was used,—a word of such technical meaning in customs procedure as to make the application of the former statute very limited. See the *Panama Hat* case, supra, 195 Fed. 438, 439.

In *Sixty-six Cases of Cheese,* 163 Fed. 367, 368,—holding that under the statute of 1890 it is not essential that there should be a completed fraud upon the United States, but that it is enough if the act or attempt is of a character calculated to deprive the United States of duty,—District Judge Chatfield concludes from certain language of the court in the *Diamonds* case, that "the entire decision is directed to the point that an actual defrauding of the government must be involved in the consequences of the fraudulent act,"—and "involved" *either* as a pregnant possibility or as an actual result. The decision is good authority against the contention, supra, that there was "no possibility of such deprival;" for the devices of concealment were, as fully shown in the discussion of the evidence herein, "of a character calculated to deprive the United States of duty." See also the opinion of the same judge in *United States v. Twenty Boxes of Cheese,* 163 Fed. 369, 372.

(ii). Even admitting an attempted concealment, there can be no forfeiture under the first part of said subsection 9, which applies only to goods the importation of which is not concealed: citing *United States v.* 218½ *Carats of Loose Emeralds,* 153 Fed. 643, 645.

[5] No reason is seen, even under the rule of strict construction, for giving the words "practice" and "appliances" so narrow a meaning. A device, or a method or means, of concealment, such as was used here, is certainly a "practice" or an "appliance" within the fair, and common, scope of these words. "Practice" is defined by the Century Dictionary as: "action; exercise; performance; the process of accomplishing or carrying out; performance or execu-

tion as opposed to speculation or theory;"—also: "an action; act; proceeding;"—also: "*artifice, treachery, a plot; a stratagem.*" "Appliance is defined by the same authority as "*something applied as a means to an end,* either independently or subordinately; that which is *adapted to the accomplishment of a purpose;* an instrumental means, aid, or appurtenance: as, the appliances of civilization, or of a trade; mechanical. chemical, or medical appliances (tools, machinery, apparatus, remedies, etc.); an engine with its appliances." (The italics above are ours.)

If the opinion in the *Emeralds* case, supra, of the non-applicability of the statute, is based upon the use of the adjectives "false" and "fraudulent" as qualifying the words "practice or appliance," then we must dissent. In our view the use of a "practice" or an "appliance" calculated to conceal (the purpose of defrauding the government being assumed as present), is a "false or fraudulent" act within the reasonable intent of language.    The Century Dictionary thus defines "false": "containing or conveying deception, falsehood or treachery; adapted or intended to mislead; said of things." And "fraudulent" is by this authority defined as: "involving or characterized by fraud; proceeding from or founded on fraud; deceitful; as a fraudulent bargain;"—also: "planning or using fraud; given to the practice of fraud." It may be noted that the decision in the *Emeralds* case was affirmed, 154 Fed. 839, but on grounds not involving the special point made by the court below, 153 Fed. 643, 645. and relied on by the claimant here.

As suggesting light on this contention, reference is made to the decision in *United States v. A Cargo of Sugar*, 3 Sawy. 46, 25 Fed. Cas. 288, 290, No. 14,722, from which the inference seems to be justified that the court regarded the applicability of a provision of statute, 12 Stat. 737, 738, similar to (and the predecessor of) said subsection 9, as not depending upon concealment or non-concealment.

(iii).   As the claimant freely pointed out the baggage and without attempt at concealment removed articles from the trunk and other containers, there was a sufficient disclosure to put the customs officer upon inquiry, or notice of the dutiable character of the goods, and, therefore, no forfeiture could arise: citing *United States v. One Pearl Necklace*, 111 Fed. 164, 170; *United States v. One Trunk* (McNally, claimant), 184 Fed. 317, 318.

[6]   The evidence does show that the claimant freely pointed out her baggage and without any active attempt at concealment removed articles from the trunk and other containers, but it also shows, for instance, that in removing kimonos and spreading them out on the table she only unfolded them but did not open them so as to disclose the inside or "wrong" side—which may be characterized as passive concealment, or "bluff." Indeed, as the fact is here found, she pointed out and opened up nothing that was concealed. But, in any event, the argument of the magic effect of "putting an officer on inquiry," cannot justly be invoked when it amounts to the curing of an attempt to smuggle by the mere fact of its successful concealment, whether accomplished through the skill of the smuggler or the want of acuteness of the inspector. In our view of the statute, the smuggler cannot escape by merely leading the inspector up to where the goods are concealed and doing everything short of opening them to view. Otherwise, the game would be one in which the dishonest importer could not lose. The statute is hardly capable of an application so contrary to its object. The "putting on notice," to be effective, must be bona fide, not mere bluff,—something actually, and fairly, equivalent to a direct statement declaratory of the goods in question. The "putting on notice" is measured not by the inspector's astuteness, keenness of scent (or the lack of it), but by the importer's good faith and real intention to make a fair declaration either by a direct statement or its equivalent. The language of Judge

Hoffman, in the case of *A Cargo of Sugar*, supra, 25 Fed. Cas. 288, 290, is pertinent:

"If the party has used those means he is clearly guilty of the offense, whether the collector knew of the commission of the offense at the time it was committed, or only discovered it afterwards. In either event the statute operates, and confiscation follows as a consequence of the employment of the fraudulent means to effect an entry of the goods. Nor does the character of the device, whether flimsy or transparent, or readily or with difficulty to be detected, provided it be fraudulent, affect the question. The degree of skill, ingenuity, or cunning with which the fraud is contrived, can make no difference."

And see Id., 289, col. 2, imposing a high degree of good faith in informing the customs officers.

(iv). Inasmuch as it was impossible for the claimant to make an entry of the goods because of their "premature seizure," there could be no violation of the law: or in other words, the inspector having, by seizure of the goods without request of a formal entry as required by law, deprived the claimant of the right to "change her mind" (*locus penitentiae*) which she had up to the time of entry, she cannot be held for any failure to declare these goods: citing *United States v. One Trunk* (Gannon, claimant), 175 Fed. 1012, 1015; *United States v. One Trunk* (McNally, claimant), 171 Fed. 772, 774; *United States v. One Pearl Chain*, 139 Fed. 510, 512; s. c. 513, 515, 516; also subsection 7 of section 28 of the tariff act of 1909, permitting an entry to be corrected.

[8a]  No decision is known which holds that in a case of attempt as distinguished from mere intent or mere preparation for an attempt (see the case of *One Pearl Chain*, 139 Fed. 515; 1 Words and Phrases, 623, col. 2), there is any *locus poenitentiae* for the dishonest importer when once his fraudulent concealment is discovered "after the goods (have) reached this country," and he has begun "that series of acts through which, by application to the customs officials, he gains possession of his goods."     See the case of *One Trunk* (McNally, claimant), supra, 171 Fed. 774;

*United States v. 28 Packages of Pins,* Gilp. 306, 28 Fed. Cas. 244, No. 16,561. In the *Trunk* cases, (Gannon, claimant, and McNally, claimant), supra, the goods were found to have been entered as imported merchandise and not as personal baggage (175 Fed. 1015, 1016; 192 Fed. 913, 914-915, and 184 Fed. 318-319). In each case the importer there indicated to the customs officer that the goods were to go to "public stores," i. e., for examination and appraisal as imported merchandise, and in each case there was no attempt to conceal the articles themselves, for they were all itemized though undervalued, in the invoices which were submitted to the customs officials, in the *Gannon* case directly (175 Fed. 1014-1015) and in the *McNally* case indirectly through the consul (171 Fed. 773). In the case of the *Pearl Chain,* supra, the steamship passenger before landing filled out the printed blank form of declaration furnished her by the customs officer, which placed the special item "jewelry" under the general heading "wearing apparel." 139 Fed. 514-517; s. c., 123 Fed. 371, 376-377. As this declaration did not provide for an itemized list of the dutiable articles but contemplated a later, detailed entry, 123 Fed. 378, it was held that a seizure based on the mere failure of this declaration to specify the pearl chain and made before it became the duty of the passenger to complete the entry by enumerating the items of her jewelry, was unwarranted. The *Pearl Chain* case is clearly distinguished by the decisions in *Dodge v. United States,* 131 Fed. 849, 852, and *Rogers v. United States,* 180 Fed. 54, 60, 61. Why should the dishonest importer be given the benefit of a *locus poenitentiae* which he may use or not as it suits the exigencies of the occasion,—i.e., according to the probability of discovery? The mere fact of his being deprived of an opportunity to repent, is nothing which he can set up to relieve him when his fraud is detected. The doors are not to be held open for the dishonest importer. See *United States v. One Bag of Crushed Wheat,* 166 Fed. 562,

567. If the claimant here was to "change her mind" she should have done so when the inspector came to make his examination and she should then have somehow expressed her desire to declare the goods which were concealed as well as those which the trunk, bag and basket purported to contain. But having deferred disclosure, and her concealment having been discovered, it was then too late for repentance.

Subsection 7 aforesaid affords the claimant no aid. It allows amendment of the written entry, only by correcting misstatements as to value of a declared article, and not by supplying items of which the claimant has failed to make any declaration whatever. It applies to items which are stated but whose value is incorrectly given,—not to items which are not stated at all, but which it is the claimant's duty to state. The distinction is suggested in the case of the *Bag of Crushed Wheat*, supra, 166 Fed. 567.

"A crime once committed, may be pardoned, but it cannot be obliterated by repentance. Therefore, if a man resolves on a criminal enterprise, and proceeds so far in it that his act amounts to an indictable attempt, it does not cease to be such though he voluntarily abandons the evil purpose." 1 Bishop's New Criminal Law, sec. 732. See Id., sec. 728.

(v). Owing to the claimant's being in the custody of the immigration officers up to the time of the examination of her baggage, and owing to the absence then of any qualified customs officer before whom an oath could be taken, it was impossible for the claimant to make entry prior to seizure of the goods; and until the time expired within which she might make entry, she could lawfully abandon any fraudulent intent (if she had any) and make proper entry.

[7] This is practically the same as contention (iv) supra, and the same authorities were cited in its support. So far as concerns the fact of the absence of any officer qualified to administer an oath, it is true that the only customs officer present was not so qualified, but this, in our

view, is immaterial. The fact that an extraordinary "short," practice was adopted cannot excuse an attempt which had been carried as far as the claimant could carry it, a design which was calculated to defraud the government, and which was actually set in motion and well under way,—particularly when that practice of the local customs house was adopted quite as much for the convenience of the incoming passenger as for the customs officials themselves, and was being acquiesced in by the claimant, who is presumed to have known the laws as well as anybody is, and who might, in theory at least, have demanded the privilege, under the law, of making a formal entry in the usual way. This point may well be emphasized in the language of Judge Thomas, in the case of *United States v. Rosenthal*, 126 Fed. 766, 761: "The dishonest importer . . . ought not to be heard inveighing against anomalous methods."

(vi). As the goods were of more than $500. in value, a regular entry was required, for the making of which the Customs Regulations, 1908, articles 615, 1092, give one year, the seizure was "premature" and no forfeiture can follow.

[8b] This treasury regulation applies to "unclaimed merchandise" which "if not . . . entered within one year, . . . should be sold at public auction." The merchandise seized here is not within the class thus provided for. While it is the government's policy to extend time in the case of innocent delinquents, its favors are not given in order to afford a *locus poenitentiae* to the dishonest importer who has been discovered in an unlawful effort to introduce goods through the customs line.

(vii). That section 2785 of the Revised Statutes gives the claimant fifteen days within which to make the entry in writing, and no forfeiture can here arise, as the goods were seized without allowing any opportunity for this advantage.

[9] The fifteen-day privilege may not be used to shield a plain violation of subsection 9. It is a forced and un-

reasonable application of this time extension, to say that one who has done what is clearly an attempt to evade the law may invoke this privilege when his attempt is discovered in the very course of the goods through customs inspection and after he has done all in his power to effect his object. Whether through ignorance of her privilege of making a written entry—and the law is no respecter of ignorance,—or whatever the reason, the claimant was actually pursuing a different course in accordance with local practice. The court should not go out of its way to find excuses for the importer who if she had been pursuing one of the ordinary courses of getting goods through the customs line, might have been entitled to an extended time to complete the entry.

Moreover, the fifteen-day provision seems to apply not to articles brought in the baggage but only to merchandise brought in the cargo. The case of the *Pearl Necklace,* supra, 111 Fed. 164, 168-169. At least, it does not apply to goods brought in the baggage and to be taken immediately away; for "until . . . . entry has been made, the baggage cannot be landed." Id. 169.

(viii). Merely "a cause of forfeiture plus arrival of the goods in the United States" is not enough to sustain this proceeding,—the goods not having been entered, and there having been no introduction, or attempt at introduction, into the commerce of the United States; citing the *Panama Hat* case, 195 Fed. 438, 439-441, and the case of the *Diamonds,* 130 Fed. 965.

[4b]   The contention is disposed of by the fact that this is not a case of "mere arrival in the United States;" for the goods were already on their way through the hands of the customs inspector. If the goods had not gone so far on their course, there might be more room for argument in claimant's behalf,—though this suggestion is not meant as a ruling that her own "death-bed" disclosure would work immunity for acts already complete as an attempt. Here, by nondisclosure when it was her duty to disclose, there was not

only a purpose to conceal, but the claimant was actually carrying· out that purpose. Indeed, at the time of the discovery, she was "lying low" as a part of her scheme of deception and in the hope of its successful consummation. See *United States v. Mescall,* 164 Fed. 587, 588-589. In the decisions the making of a fraudulent invoice is not of itself held to be an offense, until followed up by an actual attempt to *use* it for the purpose of entry. In the case at bar not only were these fraudulent devices calculated for concealment, but the claimant was actually making use of these devices. See *United States v. Twenty-eight Packages of Pins,* supra, 28 Fed. Cas. 250. Fortunately, the present case is relieved from any border-line difficulties. See the cases of *One Trunk* (McNally, claimant), supra, 184 Fed. .317, and of *A Cargo of Sugar,* supra, 25 Fed. Cas. 288-289.

(ix) The government has failed in its proof, for want of any showing of an attempt to enter or introduce the goods *into the commerce* of the country; citing the *Panama Hat* case, 195 Fed. 438.

[10] There is no direct evidence of an intent to introduce the concealed goods into the commerce of the country, but the circumstantial evidence of such a purpose is by no means insignificant. The bearing on this point of two of the letters found in the claimant's baggage has already been pointed out. There can be no question that this alone was evidence sufficient to sustain a finding so far as this element of the case is concerned.

(x). Mere acts of concealment, such as here attempted to be shown, are not sufficient to work a forfeiture: citing *Keck v. United States,* 172 U. S. 434; *United States v. Harts,* 131 Fed. 886.

While mere acts of concealment were held in the *Keck* case, supra, not to work a forfeiture, the statute there involved was not broad enough to cover attempts. Id., 434, 444. The statute now in force expressly covers attempts. The *Keck* decision itself points out the distinction between

attempts and accomplished acts, and is far from holding that "mere acts of concealment" may not be attempts. Id. 445. The claimant here had done all that she could to effect her purpose, the success of the enterprise then depended only upon the want of acuteness of the inspector. In the language of Judge Hopkinson in the case of *Twenty-eight Packages of Pins*, supra, 28 Fed. Cas. 250, "the machinery was ready;" its further use depended upon another and innocent person, the inspector. At all events, the claimant's acts were not mere, innocent, acts of concealment but acts of concealment growing out of a fraudulent intent; the case is thus distinguished from the *Harts* case in which the intent was not fraudulent. *United States v. Harts,* 131 Fed. 886, syll. 3; s. c. 140, Id. 843.

(xi). The testimony shows the customs officer to have been proceeding under sections 2799, 2801 and 2802 of the Revised Statutes, and, therefore, until entry there could be no forfeiture; also following the case of the *Pearl Necklace,* 111 Fed. 164, 131 Fed. 849, the procedure under these sections was the proper, and only, procedure, and, therefore, section 3082 in particular (upon which the first count of the information is based) has no application.

(xii). The goods being in the baggage, the "baggage" statutes, sections 2799-2802 aforesaid, apply, and there must be an entry (i.e., in writing) and failure to disclose certain articles, before those articles can be forfeited: citing the *Pearl Necklace* case, supra.

(xiii). But if the goods do not come within the "baggage" statutes, supra, then the "trunk" cases, supra (wherein the goods were regarded as merchandise and not baggage, although found in trunks), apply, and the importer has fifteen days within which to make entry.

The question is not, what was the procedure followed by the inspector, but what was the statute, if any, infringed by the claimant? See discussion under contention (v) supra. So far as section 3082 is concerned, if counsel mean, by contention (xi), supra, that it has no application because there could be no importing "contrary to law" (sec. 3082) when

there still remained a *locus poenitentiae,* then nothing more need be said than already said in the discussions of contentions (iv), (v), (vi), (vii), supra. The matter of the fifteen-day privilege has been disposed of elsewhere.

(xiv). Guilty intent must be proved, which proof is wanting here; citing *United States v. One Silk Rug,* 158 Fed. 974; and the burden of proof in such case is on the government. Id.

[11a] So far as the government is concerned, the requirements of proof have been fully met. As to the burden of proof, the court has found the existence of "probable cause" for the prosecution of the information. Wherefore, under Rev. Stat., section 909, this burden lies upon the claimant. See the cases of the *Pearl Chain,* supra, 139 Fed. 510-511, and of the *Bag of Crushed Wheat,* supra, 166 Fed. 568.

(xv). The government must establish the allegations of the information by proof to a moral certainty and beyond any reasonable doubt: citing *Chaffee & Co. v. United States,* 18 Wall. 516; *Boyd v. United States,* 116 U. S. 616; *Clifton v. United States,* 4 How. 242.

[11b] A proceeding *in rem* to forfeit is a civil proceeding, and the ordinary rule of preponderance of evidence applies: *Lilienthal's Tobacco v. United States,* 97 U. S. 237, 271-272; *The Good Templar,* 97 Fed. 651-653. See *The Three Friends,* 166 U. S. 1, 50-51; 23 Ops. Atty. Gen., 63, 64, syll.

(xvi). The statutes involved are to be strictly construed; citing the *Panama Hat* case, 195 Fed. 438, 439, 440; and such construction makes for the claimant.

[12] Though these statutes, being penal in character, are to be strictly construed, they are also to be construed reasonably and so as to give effect to every word, including the word "attempt," and including the word "may" in the phrase "by means whereof the United States shall or may be deprived of the lawful duties," this word being used in the act of 1909 by way of amendment of the act of 1890,—

an amendment which may well have been made in contemplation of rulings such as that in the case of the *Diamonds,* supra. See *In re Suekichi Tsuji,* ante, p. 52; *In re Nakashima,* 3 U. S. Dist. Ct. Haw., 168, 175; *United States v. Aultman,* 143 Fed. 922, 928; also dissent of Judge Ward, in the *Panama Hat* case, supra.

Under subsection 9 aforesaid, the forfeiture is "not limited to the mere goods in relation to which [the] fraudulent practice is used," but extends to "the whole of the merchandise . . . in the case or package containing the particular . . . articles to which such fraud . . . relates." Wherefore, the prayer for forfeiture of all the goods found in the trunk, bag and basket, is well founded

The technicality of the law of customs administration, and some degree of inflexibility and unwieldiness in the statutes, and in particular, some improvident generalizations in the decisions, all affording plausible arguments in behalf of tariff evaders, have made the contentions of claimant's counsel "easier to overrule than to answer" (Jeremiah Black, Essays, &c., 207), especially on the question involved in most of their argument, of *locus poenitentia,* or the "recall" of attempts. This may excuse a more extended consideration of facts and law than would otherwise have been indulged.

Let judgment be entered pursuant to the government's prayer, with costs against the claimant.

---

*Reported,* 23 Treasury Decisions, 31 (T. D. 33019).